and we'll turn to the last case on our calendar this morning which is Building Service 32 BJ Health Fund versus Nutrition Management Services Company Mr. Pope, perhaps you could begin by asking, I have an administrative question to be certain that I'm understanding this. This case is related, is it not, to the case known as . . . well, it has the same caption I guess as this, it's a different docket number that is before a different panel of the court. Is that right? It's related to that case, Your Honor. That case involves the pension fund. This is the health fund. This is the health fund, yeah. Okay. Yes, and Judge Droney, we've got to stop meeting like this. Is your argument the same as it was in the pension fund case about the incorporation of the amendment to the CBA? Is all that argument the same? I know it's referenced in the briefs. It is. I think we added one . . . I think by the time that we got to this one, the argument had been raised by the health fund, which had not been raised by the pension fund, but the 2014 amendment applied retroactively and we had directly addressed this here. That was addressed at oral argument in the pension fund case since the pension fund had not raised it in the briefings, but otherwise it is the same. The language of the collective bargaining agreement on the two fund provisions is essentially identical. And the amendment as well, in 2014? Right. The amendment in 2014 is an umbrella amendment as to all funds. May it please the court, what's past is prologue, Shakespeare told us, and that tells us, of course, that we get context from the past, but while the past helps explain the future, the past is not the future, and the future is not the past, but you have to embrace that the claims regarding a period of time from August of 2008 to January of 2012 were resolved in a settlement agreement as part of a prior lawsuit, and that prior lawsuit said that the claims were wiped out, but for certain exemptions put into an agreement. You have to procedurally follow through that the case was dismissed with prejudice before the settlement agreement was entered into, so we start with a concept that race judicata would bar all of those claims of the transactions from that period except for how the parties agreed to preserve them, and to the extent that they were preserved in this instance, they were preserved with an indication that future funds audits, payroll audits, would be allowed, and it is the contention of the company that future funds payroll audits refers to payroll audits that go from February 1 of 2012 forward, which was a future period in connection with executing that agreement. It is the contention of the funds, and it was accepted by the district court that that future funds audit included two things, one of which is patently absurd, and one of which I think that the record rebuts. One that . . . . . . . . . . . . . . . . . . .  . . I'm going to ask you if I've understood some of the proceedings below. The district court originally denied summary judgment on the theory that the language of the settlement agreement was ambiguous and couldn't be decided as a matter of law. Then after a bench trial, the district court ruled that the language of the settlement  That is correct, Your Honor. What are we to make of those inconsistent rulings on what appears to be a question of law? Well, Your Honor, I think that first the district court got it right in the first instance, which was that it was an ambiguous agreement and that she should have looked to the factual materials rather than deciding that it was unambiguous after the trial. Right. Now, the judge did rule in the alternative that it was ambiguous, and then based on the trial rulings, it seems to have credited the fund director's version of what the intent was, correct? She does credit the fund director's version, and that version, much like the version that she rejected from the company, was an unexpressed intent that was not exchanged between the parties. She said, on the one hand, the company's interpretation was unexpressed, so she wasn't going to give it credit, but she credited what was admittedly the unexpressed intent of the fund. I think that's inappropriate, Your Honor, for resolving this, and we have other interpretational tools to resolve that ambiguity. I'm trying to make sure I understand you. Is your argument that she decided that the fund director's construction was better than the other sides? She didn't decide whether there was ever a meeting of the minds of the parties on that intent? Is that your argument? I believe that is, in fact, what she did, Your Honor. She decided that she agreed with the fund director's construction, that he said, well, that's what I always put in. That's what it always means. That's what he understood, not necessarily what the parties had come to a meeting of the minds on. Is that your argument? It is, Your Honor. Then I'm going to ask your adversary why that shouldn't be how we view this. Right. And, Your Honor, I would point out that we have the testimony of Mr. Gonzales, who was the fund's director, who said that he did not explain this provision to the company. He did not discuss it with them. No, but the question then becomes whether this was, in fact, such routine practice that everyone would understand it to be the expectation. Well, I think that, Your Honor, if you look at, actually, case law out there, and there's a couple of cases where the plaintiff involved is Hanley, who's the trustee of I-can't-remember-what fund against Larks, Deli, and some others that we've put in the papers, this similar language has been found ambiguous, and it's not definitive. And frankly, the fund itself has changed its language over time and written more specific language in other cases. So there is, I think, an apparent ambiguity here, and there's a context in which you can view the ambiguity. But, Your Honor, if I may, there's one point of the ambiguity that I think I really want to strongly emphasize here, which is the audit that they're relying on to go back against the period from 2008 through 2012 in its entirety is based in part, in large part, on an audit that was conducted by Stuart Gritz for the North Pension Fund, and it was completed in 2011. Now, even if we assume the types of . . . even if we assume the interpretation that the fund would put forward to you, Your Honor, how is that past audit qualify as a future audit, future funds audit, under the terms of the settlement agreement? Were the audits different, though, the audit that resulted in the settlement agreement? Was that just an audit of the books that were presented to the fund, and that the subsequent audit was a different kind of audit? It seems to suggest that in the paper. Well, there wasn't an audit for the settlement agreement, and that was something that Mr. Gonzalez said. The litigation that led up to the settlement agreement. Yeah, yeah. Was that like a self-reporting type of audit, and then the second audit was a more intensive audit? Am I right? Yeah, there is a difference between what they say they were claiming on, Your Honor. We don't see, when we ultimately get to the audit that's reported, how that was factored out, but that is the fund's position, is that the first claim for what they were suing on was what was unpaid but reported, and that the audit ultimately was about what may have been unreported. We have a rather extensive argument about how Mr. Kahn, who was the auditor, made a lot of errors. Can you explain that language in Section 3 of the settlement agreement where, look, we'll pay the $300,000 . . . we'll accept the $300,000, but if there's a subsequent more in-depth audit of that same period, we're not prohibited from seeking additional funds. Does that make sense? Your Honor, I understand that that is what they wanted it to say, and I would say two things to that. One is, a great deal of what they claimed and got a judgment on was not a subsequent audit. It was an audit that was already in the books at the funds at the time. It was in the North Pension Funds, which was also under Mr. Gonzales' supervision. It was in their books, and they just blew the dust off of it and used it to assess. The other is, I don't think that that's what the language says. I don't think that that's what they accomplished with it. I think that they created contradictions within this agreement. Thank you, sir. You've reserved some time. Mr. Sturm? Good morning, Your Honors, and may it please the Court. My name is Ira Sturm. I am the attorney arguing the case on behalf of the appellee. Along with me is my associate, Mr. Bloom. I will be addressing most of the issues. Mr. Bloom will address the issues concerning the prior settlement. In the context of this case, the question is what level or what standard of review the Court will give, and it's the appellee's position that on most of the issues, the standard of review is one of de novo. However, on the estoppel issue, on the settlement issue, the Second Circuit has a test of whether . . . it's a de novo test, but with a general assessment of whether fair, based upon the abuse of discretion standard. Although in my brief I suggested that there is a Supreme Court case that says all issues that involve equitable relief should be reviewed under the abuse of discretion standard, I understand that one panel will not generally overrule another panel. So we will address the Court, and we believe that we would win either if reviewed under the entirely de novo standard or under the Second Circuit standard. One of the issues that they have raised in their appeal is whether or not the statutory relief scheme as provided in ERISA applies. In their argument to the Court, they argue that they are not bound by either the ERISA scheme or the contractual scheme. The judge ruled on the ERISA issues and said we're entitled to ERISA relief, which under 1132G2 says we're entitled to the interest rates and the liquid data damage rates as provided under the plan. Under the plan means not what is physically written in the plan, it's broader than that. And the proof of the matter is the cases cited, all by counsel for the appellant, all address issues that arise under different sections of the ERISA statute, which sections do not apply under 1132G2. For example, in the Amara case that was cited, the argument was brought under the first section, G1, and G1 does not say anything about under the plan or liquid data damages or interest. Same with the other cases cited, M&G Tackett and Silverman. Based upon that, we believe that the standard review should be, not the standard, the interest rate should be as assessed under ERISA. Mr. Sturm, let me ask you a question about how we can assure ourselves about the reliability of the audit report. The district court never addressed the argument about the report's alleged efficiencies. I'm referring to the district court's decision, opinion and order of June 15, 2018. That's the case, right? She didn't address that. Your Honor, by not addressing it, she's rejected the argument. If the record is reviewed, you will see that the funds had testimony concerning what efforts were taken, the steps taken, and what books were reviewed, all based upon the employer records. The employer raised a smoke screen saying it's wrong, but never produced an iota of evidence to suggest what exactly was wrong. What about Kahn's testimony, though? Kahn said he was wrong about the 40-hour testimony. What about his interpretation of regularly? The district court never . . . Just to follow up on Judge Cabranes' question, the district court never talked about that or the regularly definition of Mr. Kahn, right? The question became, I believe, whether 20 hours or 20 hours or more, and the records showed that they worked more than 20 hours. It was an argument, but there was no factual support to support the employer. It was an argument. It was argument raised, but there was nothing in the record to suggest that the calculations were wrong. Can I ask you to try to help us understand the relationship between the 2011 audit report by Mr. Gritz and the 2013 audit report by Mr. Kahn, for the health fund, of course? Sure. Is it simply the case that both auditors relied on the same data and then conducted their analyses using different parameters or principles? Well, there are different principles for eligibility for pension, and there are different principles for eligibility under the health fund. With regard to the two audits, the north funds, in the prior case, had asked for an audit. That was the subject unbeknownst to the south fund, the health fund here. After the settlement was negotiated, in due course, a general audit was asked of nutrition management for the health fund, the appellee here. In order to just move things along, the auditors were the same auditing firm, so they already had the payroll information, and as a result, they had the payroll records that were already in their possession, in the context of not the pension fund, which was done two years earlier, but in the context of the health fund. What was found was that the appellant was hiding people. It's literally just not reporting people that should have been reported, and that is part of the problem in the case. This is a self-reporting case, and in the earlier argument, it was suggested that there were two audit periods, but it's really not two audit periods. What it is is it's a self-reporting case situation. Employer reports people worked, either pays or doesn't pay. That was the settlement. He reported people as working, and they weren't paid. In due course, the checks and balances came into view. We audited the books, and we said, hey, he's not reporting these people. So there are two different situations. One is the employer's honesty in reporting the correct people, and the other is the overall checking up to make sure that . . . Did he over-report a couple people, too, though? That was alleged, but I think it was never proven. Did the district court address that issue? I believe the district court accepted the argument, but there was absolutely no evidence to support what they contended. I will now turn over the podium to my associate. Good morning, Your Honors. May I please report? So to just piggyback on what my boss said, to clarify one point here, the fund system is self-reporting, and that self-reported information by employers is verified by audits conducted by the fund's auditing firm as a way to keep employers honest. That's a fact that doesn't appear to be a dispute. There's no one audit, and then there was a more piercing audit. The pension fund audit is completely separate from the South Health Fund. And I think the second point that is also undisputed is that the prior litigation with the health fund, the, I believe, $575,000 figure was based solely on self-reported SIS information by the employer. So with those two things in mind, we submit that the settlement agreement language is clear and unambiguous, because what we have is we're trying to resolve a case where the money is all based on self-reported information, but the funds still want to be able to audit them later, because they might be hiding people, whether intentionally or mistakenly. So... I'm not sure I understand what you said to us. You're saying the health fund and the pension fund audits were separate. That's correct. All right. But the settlement says it's in full satisfaction of unpaid benefit contributions. It doesn't say in full satisfaction of unpaid pension benefit contributions or health benefit contributions. And so isn't that your first problem? That the language of the settlement speaks to benefit contributions without making the distinction you've just made to us? No, Your Honor. The parties to the settlement agreement were the Building Service 32BJ Health Fund and Nutrition Management Services. So whenever the fund is referred to therein, it's referring to the health fund. So then there's the pension fund audit, and it reveals further errors in connection with the health fund contributions. No. I think that the Nutrition Management's position kind of confuses the facts here. They're trying to create one continuous audit that does not exist. We have two separate audits. But the thing is that, you know, what do you audit when you do an audit? The employer's payroll. So when Mr. Khan was doing the health fund audit, the Schultes and Penitentiary, the auditing firm, had done for the North Pension Fund an audit of Nutrition Management years earlier. So in reaching back to the period, I believe, from 2008 to 2011, they just used the payroll summaries that had been put together by Mr. Gritz. The audit itself for the health fund didn't even begin until 2013. So they don't have a relationship to each other, except that they're the same employer, and their source information in regards to that time frame is the same. That's it. There's not a relationship between the two other than that. So with that in mind, the settlement agreement really couldn't be more clear. We have contributions that are defined as those that are self-reported. They do not refer to any future audits, which has to mean future audits conducted in the future, because this whole release is through January 31, 2012. If it was a future audit from February 1, 2012 onward, then the language is completely superfluous. And what the district court did in finding that the testimony of the funds was more credible, in seeing that the contract was ambiguous, Mr. Gonzales' testimony was confirmed by the fact that the agreement itself confirmed his intent, in part because in order to agree with them, you've got to just completely overlook that sentence, because I don't think anybody could rationally say, well, we're going to have a waiver through January 31, 2012, but we're going to have a carve-out for stuff after January 31, 2012. Like, that doesn't make any sense. So I think the unexpressed intent of nutrition management was weighed against the testimony of the funds, which was confirmed by the very language of the document itself. So, let's see. Oh. Well, one more thing I want to say in regards to Your Honor's thing about denying summary judgment. The funds agree that we think summary judgment should have been granted at the outset. The judge did note that summary judgment might be lurking in this case. But what honestly happened is Judge Flores bent over backwards to allow nutrition management to present all the evidence it could in order to show that its interpretation of the agreement was valid. They didn't do it. So at the end of the day, no matter how you slice it, all roads lead to affirming the judgment of the District Court. The District Court's judgment was entered after a bench trial, right? Correct. She entered findings? Yes. And she entered conclusions of law? Yes. Okay. Thank you. Mr. Pope? Thank you. The notion that nutrition management was hiding people brings up one of the most important issues in terms of how this was inaccurately computed. The agreement calls for paying benefit contributions for the number of people who have worked more than 20 hours a week. It doesn't call for providing for the identity of specific persons. So if nutrition management paid for 25 people in a month and 25 people worked more than 20 hours, it owes nothing even if it mistakenly identified two people who didn't work more than 20 hours among the 25 it sent in and the fund later finds two other people. Those two other people don't get retroactive health care. This is a health care case, Your Honors. This isn't a pension case. And this is one reason, Judge Droney, why I didn't bring this issue up in the pension case. Because in the pension case, there's actuarial issues about contributions and everything else. But this is a health fund case, and people don't get that coverage back. The fund was covering a certain number of people and it got the contributions for them. And our argument was they didn't do anything with that. We did put in evidence as to what the problems were with that. We also put in evidence showing . . . Can I ask you what you make of the Kahn testimony about the 20 hours or more than 20 hours and then the definition of regularly? Do you claim the district court should have addressed that? Oh, yes, Your Honor. Why is that? Because Mr. Kahn admitted that at least one of the ones that he provided us information on was an error that he shouldn't have included him as somebody for having been left out. And he didn't know what the definition of regularly should be, so he made up one himself. Now, out of all the people who can interpret the collective bargaining agreement, Your Honor, which are management and the union, Mr. Kahn in the auditing firm for the fund doesn't fall into either of those categories. And he didn't consult either of those two categories. He didn't obtain for himself the proper support to come up with his definition of regularly. He needs to have something more than just what his own opinion is. The one last thing I would say, Your Honor, as I'm running out of time, is with regard to the argument that Mr. Sturm brought up about contesting whether or not the delinquency policy is the plan, the reason we look to the other provisions, such as 502A1, 502G1, all the other ones that we identify in there is because the word plan in ERISA has the same meaning throughout the statute, and particularly when it refers to the plan. We referenced in our reply brief a Supreme Court decision that was handed down the day that I filed the brief, so I didn't even have a reporter site for it, which says that there's significance to the word the and what it means in interpreting the statute. And for all the reasons that are in the briefs and everything you've heard today, Your Honors, we believe you should vacate the judgment and remand in accordance with the arguments that we've set forth. Thank you, Mr. Pope. We'll reserve the decision, and we're adjourned. Court is adjourned.